## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| SIMPLEXITY, LLC, *et al.*, | ) | Case No. 14-10569 (KG) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| CHARLES A. STANZIALE, JR., | ) | |
| Chapter 7 Trustee of Simplexity, LLC, | ) | |
| *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 16-50739 (KG) |
| | ) | |
| SPRINT CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | **Re: Adv. D.I. Nos. 29, 36** |

## OPINION

## INTRODUCTION

On March 16, 2014 (the "Petition Date"), Simplexity, LLC ("Simplexity") and its affiliates (collectively, the "Debtors") filed petitions for relief under Chapter 11 of the Bankruptcy Code. D.I. 1. On January 7, 2015, the Court entered an order (the "Conversion Order") for relief which converted the Debtors' bankruptcy cases to cases under Chapter 7 of the Bankruptcy Code and appointed a Chapter 7 Trustee (the "Trustee"). D.I. 629. On May 11, 2016, the Trustee brought this adversary proceeding against Sprint Corporation ("Sprint") alleging that payments (the "Transfers") totaling $3,842,951.86 are avoidable under 11 U.S.C. § 547(b) and recoverable under 11 U.S.C. § 550. Adv. D.I. 1. The Trustee

has since modified the avoidance amount and now alleges that $958,198.58 is recoverable (the "Amended New Value Analysis"). Adv. D.I. 36.

Pending before the Court is Sprint's motion for summary judgment (the "Motion") pursuant to Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056, seeking dismissal of the Trustee's avoidance action. Adv. D.I. 29.[1] In response, the Trustee filed a cross motion for partial summary judgment (the "Cross-Motion") seeking summary judgment in the Trustee's favor. Adv. D.I. 36.[2]

The issues presented by the Motion and the Cross-Motion are: (1) has the Trustee satisfied his burden for tracing under 11 U.S.C. § 547(b)(5), i.e., demonstrated that Sprint received more by the Transfers than if the case were filed under Chapter 7; and (2) is Sprint entitled to a new value defense for two transfers—$505,151.53 and $125,000.00— made to Simplexity?[3]

For the reasons stated herein, the Court finds that the Trustee has satisfied his burden for tracing under Section 547(b)(5). The Court, however, will grant summary judgment in favor of Sprint for demonstrating that it is entitled to a new value defense for the $505,151.53 payment on March 12, 2014. The Court will also deny summary judgment to Simplexity and Sprint regarding Sprint's alleged new value payment of $125,000.00 on March 7, 2014. Lastly, the preference claim of $328,047.05 remains valid and outstanding. *See* Motion at p. 13.

---

[1] Adv. D.I. 29 references "*Sprint Corporation's Amended Motion for Summary Judgment.*"

[2] Hereafter, references to the Motion and the Cross-Motion will be to the supporting briefs (Adv. D.I. 30, 37).

[3] The parties have not asked the Court to consider additional defenses under Section 547(c). Motion at p. 13, n. 6.

## JURISDICTION

The court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(a) and 1334. This adversary proceeding is a "core" proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (F). Venue is proper pursuant to 28 U.S.C. § 1409.

## FACTS

Simplexity, headquartered in Virginia, was the largest independent online activator of mobile phones in the United States. Declaration of Frank C. Bennett III, dated March 17, 2014 ("Bennett Decl.") ¶¶ 5, 8; D.I. 9. Simplexity reached prominence by "simplifying the extraordinarily complex process of selling and activating mobile devices for physical and online retailers[.]" Bennett Decl. ¶ 7. Simplexity's easy-to-use interface and design systems reduced in-store activation time from an average of 45 to 55 minutes, to approximately 20 minutes. *Id*. Simplexity was not only the largest independent online activator of wireless devices for Verizon, T-Mobile and Sprint, but the Debtors also powered sales for 15 of the top 20 mobile phone retail websites. *Id*. ¶ 5. Among Simplexity's clients, Sprint and Simplexity maintained a long business relationship. Declaration of Juliette Morrow-Campbell, dated June 29, 2017 ("Morrow-Campbell Decl.") ¶ 9; Adv. D.I. 30.[4] Despite Simplexity's prior success, mounting economic tension and tightening liquidity led to the Debtors' March 16, 2014, bankruptcy filing. Bennett Decl. ¶¶ 14-17; Morrow-Campbell Decl. ¶¶ 11-12.

---

[4] Adv. D.I. 30 references the "*Revised Declaration in Support of Defendant Sprint Corporation's Motion for Summary Judgment.*"

In order to best understand the complexities of this adversary proceeding, it is necessary to discuss both the agreements entered into between Simplexity, Sprint and affiliated entities and the events as they unfolded leading up to the Petition Date.

## Sprint and Simplexity Agreements

*A. Online Authorized Representative Agreement*

On March 23, 2009, roughly five years before the Petition Date, Simplexity and Sprint Solutions, Inc. ("Sprint Solutions"), a Sprint affiliate, executed an Online Authorized Representative Agreement (the "OAR Agreement"). Morrow-Campbell Decl. ¶ 3; *see* OAR Agreement, A0001-A0036. The OAR Agreement, in part, permitted Simplexity to solicit and subscribe customers to Sprint Solutions products and services. Morrow-Campbell Decl. ¶ 3. Simplexity could either purchase products from Sprint Solutions and resell them to customers, or sell products directly from Sprint Solutions' inventory. *Id.*; OAR Agreement ¶ 5.2. For products Simplexity purchased on credit, Sprint Solutions received a purchase money security interest ("PMSI") in the products and proceeds from the sale of such products. Morrow-Campbell Decl. ¶ 4. Sprint Solutions recorded the PMSI with the Delaware Secretary of State on September 30, 2009, and provided properly authenticated notice to other secured parties. *Id*; Cross-Motion ¶¶ 7-9; OAR Agreement, Ex. B, ¶ 8.

The OAR Agreement also provided a commission schedule (the "Commission Schedule") payable from Sprint Solutions to Simplexity for satisfying certain goals, such as subscribing new customers, upgrades and retaining current customers. Morrow-Campbell Decl. ¶ 5; OAR Agreement, Ex. A. The Commission Schedule was subject to

amendment and was most recently amended in July 2013. Morrow-Campbell Decl. ¶ 5. Specifically, the Commission Schedule provided for Sprint Solutions to make payment to Simplexity at the end of each monthly commission period. *Id*. ¶ 6. Before the end-of-month reconciled payment for March 2014, Sprint Solutions paid Simplexity a mid-month estimated commission. Morrow-Campbell Decl. ¶ 6. Sprint Solutions maintained under the OAR Agreement the right to setoff or withhold commissions against any amounts previously owed by Simplexity. *Id*. In order to exercise this right, Sprint Solutions was required to provide Simplexity with five days' notice prior to any such set off. Cross-Motion ¶ 11; OAR Agreement ¶ 6.2.

Around January 30, 2014 and March 10, 2014, Sprint Solutions and Simplexity amended the OAR Agreement. Morrow-Campbell Decl. ¶¶ 11-12. (Collectively, these January and March agreements are referred to as the "Commission Offset Agreements.") The March amendment provided that "Simplexity's more than 60 days' past due balance in the amount of $5,795,084.69 be satisfied by offsets of commission payments in the amount of $1 million from March 2014 through August 2014[.]" Cross-Motion ¶ 13. Sprint did not get to act in furtherance of the Commission Offset Agreements, as six days later the Debtors filed for bankruptcy.

*B. Private Label Services Agreement*

In addition to the OAR Agreement, Sprint Spectrum L.P. ("Sprint Spectrum"), a Defendant affiliate, and Simplexity MVNO Services, LLC ("Simplexity MVNO"), a Debtor affiliate, were parties to a Private Label Services Agreement (the "PLS Agreement"), dated January 8, 2012. Morrow-Campbell Decl. ¶ 7; *see* PLS Agreement,

A0037-A0220. The PLS Agreement provided that Simplexity MVNO would be "a limited purpose reseller to market PCS and 4G services as private label services." Morrow-Campbell Decl. ¶ 7; *see* PLS Agreement ¶ 2.1. Pursuant to an amended PLS Agreement, Simplexity MVNO agreed to conduct a loyalty trial program (the "Loyalty Trial Program") with certain travel-related companies, and, in return, Sprint Spectrum agreed to pay Simplexity MVNO for attaining certain eligibility requirements. Morrow-Campbell Decl. ¶ 8; *see* PLS Agreement, Ex. C. The Loyalty Trial Program outlined "phases" to be completed by Simplexity MVNO. *Id*.

On March 7, 2014, Sprint Spectrum's $125,000.00 check to Simplexity on account of Phase II of the Loyalty Trial Program cleared. Morrow-Campbell Decl. ¶ 13; Cross-Motion ¶ 16; *see* PLS Agreement, Ex. C, A0218. Sprint Spectrum was permitted to seek a refund of such payment, "but only if (a) Simplexity [MVNO] did not reach a certain goal by March 31, 2014, *and* (b) Sprint [Spectrum] made a request to Simplexity [MVNO] in writing by June 30, 2014. . . ." Cross-Motion ¶ 17; *see* PLS Agreement, Ex. C, A0218. Upon such a request, Simplexity MVNO Services would be required to refund the payment to Sprint Spectrum within 10 business days. *Id*.

### **Prepetition Credit Facilities**

*A. First Lien Credit Facility*

The Debtors maintained a credit agreement (the "Credit Agreement") with Fifth Third Bank ("FTB"), an Ohio banking corporation, who was their prepetition secured creditor, that provided for (i) a revolving loan commitment of up to $15 million, and (ii) a $30 million term loan. Bennett Decl. ¶ 10.  Each of the Debtors were obligors under the

Credit Agreement, and Adeptio I was the guarantor. *Id*. The Credit Agreement was secured by substantially all of the Debtors' assets, which included equipment, inventory, chattel paper, accounts, other pledged property and securities, investment related property, cash collateral accounts, intellectual property and commercial tort claims. *Id*.

*B. Second Lien Credit Facility*

Simplexity and Simplexity MVNO, as obligors, were also parties to a second lien credit facility with Adeptio Funding, LCC ("Adeptio Funding") as the lender. *Id*. ¶ 11. The intercreditor relationship among FTB and Adeptio Funding was governed by the Subordination Agreement, dated April 3, 2013. *Id*.; *see also id*. at n. 2 (noting there were additional agreements pertaining to the financing of the Debtors' operations).

## The Simplexity Bankruptcy Case

As previously stated, the Debtors filed for bankruptcy on March 16, 2014. D.I. 1. The Petition Date was preceded by a rapid decline in cash, tightening liquidity and several forbearance agreements with FTB. Bennett Decl. ¶ 14. Ten days before the Petition Date, Simplexity received a letter from FTB which provided that FTB intended to sweep all of the Debtors' cash on deposit, including on a "go forward" basis, and to cease any advance of additional funds. Cross-Motion ¶ 3. On March 10, 2014, FTB, in fact, swept all of the Debtors' cash on deposit, including that which was marked for payroll, and ceased to advance any additional funds. *Id*. ¶ 4. Simplexity subsequently terminated substantially all of its workforce—approximately 219 employees and 285 full time equivalent contractors. Bennett Decl. ¶ 8.

7

## The Simplexity-Sprint Relationship

Prior to the Petition Date, Simplexity and Sprint maintained a long business relationship. Morrow-Campbell Decl. ¶ 9. Based on the substantial business conducted between the parties, Sprint provided Simplexity generous financing, which included 60-day payment terms and a $12 million line of credit. *Id*. Sprint was protected by its PMSIs and revolving product supplied, payments received and commissions earned (i.e., the terms of the OAR Agreement and PLS Agreement). *Id*.

In 2012 and 2013, Simplexity paid Sprint a total of approximately $57.1 million and $49.1 million, respectively. *Id*. ¶ 10. Between 2013 and the Petition Date, Sprint continued to provide Simplexity with high volumes of product, resulting in an outstanding balance due to Sprint between $6 million and $10 million. *Id*. Sprint did not file a proof of claim in the Debtors' bankruptcy but was scheduled with the largest general unsecured claim of $7,084,990.66. Cross-Motion ¶ 19.[5] The Debtors also scheduled Sprint Solutions with a disputed, unliquidated secured claim in an unknown amount, "with collateral of an unknown value." *Id*.; *see* Sprint App. at A0293.

Sprint asserted objections to Simplexity's first day motions to approve debtor–in–possession financing (the "DIP Financing Order") and to approve bid and sale procedures (the "Bid Procedures Order"). Morrow-Campbell Decl. ¶¶ 16-17; D.I. 145, 109.

---

[5] The Debtors' Schedule F also lists Sprint Nextel with an unsecured debt of $207,174.93 and a Sprint account (# 838522266) with unsecured debt of $1.96. Cross-Motion ¶ 19; *see* Sprint App. at A0297.

Sprint's objections resulted in additional language to both the DIP Financing Order[6] and Bid Procedures Order.[7] Morrow-Campbell Decl. ¶¶ 16-17. Sprint's inventory, consisting of 1,114 handsets, was not included in the sale or the DIP collateral, and it was returned to Sprint on account of its first priority PMSI. *Id.* ¶ 18. Simplexity "maintained that no accounts receivable collected after the Petition Date was attributable to Sprint's inventory." *Id.*

## The Avoidance Action

After the tolling period, the Trustee filed this adversary action against Sprint. Adv. D.I. 1. The Trustee—initially—sought to avoid and recover the following Transfers pursuant to 11 U.S.C. §§ 547, 548 and 550 and to disallow claims pursuant to § 502:

| Date | Amount |
|------|--------|
| 12/23/2013 | $2,745,219.63 |
| 1/31/2014 | $96,596.30 |
| 2/28/2014 | $1,001,095.20 |
| 3/4/2014 | $40.73 |
| Total | $3,842,951.86 |

Adv. D.I. 1; *see* Morrow-Campbell Decl. ¶ 20. However, as the Court previously stated, the Trustee has provided the Court with an Amended New Value Analysis, reducing the amount sought from $3,842,951.86 to $958,198.58. Cross-Motion ¶ 39. The Transfers were

---

[6] *See* DIP Order ¶ 32(c) (illustrating language added at the behest of Sprint); *see also* Morrow-Campbell Decl. ¶ 16 (same).

[7] *See* Bid Procedures Order ¶ 24 (illustrating language added at the behest of Sprint); *see also* Morrow-Campbell Decl. ¶ 17 (same).

made on account of an antecedent debt and not prepayment for goods on services subsequently received. Morrow-Campbell Decl. ¶ 21; Cross-Motion ¶ 31.[8]

Before filing the Motion and Cross-Motion, the parties conducted limited discovery and, in February 2017, engaged in a failed mediation session. Cross-Motion at p. 2; Adv. D.I. 22. The Court entered a scheduling order that extended the written fact discovery deadline to June 2, 2017, limiting such discovery to the issues involved in the Motion. Cross-Motion at p. 2; Adv. D.I. 20. On May 2, 2017, Simplexity served its written discovery requests on Sprint. Cross-Motion at p. 3; Adv. D.I. 24. Sprint served its written responses to Simplexity's discovery on June 1, 2017. Cross-Motion at p. 3; Adv. D.I. 25. The parties, pursuant to a stipulation, extended the discovery period through June 23, 2017, and Sprint was provided until July 3, 2017, to revise its Motion. Cross-Motion at p. 3; Adv. D.I. 26-27. Defendant filed its revised Motion on June 30, 2017. Cross-Motion at p. 3; Adv. D.I. 29.

## STANDARD OF REVIEW

A bankruptcy court must grant summary judgment where "there is no genuine issue as to any material fact and that [each of] the moving part[ies] is entitled to a judgment as a matter of law." *In re Kiwi Int'l Air Lines, Inc.*, 344 F.3d 311, 316 (3d Cir. 2003) (quoting Fed. R. Civ. P. 56(c)). In evaluating the evidence, the court must view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion. *Id.* (citation omitted). If the moving party meets the burden, the

---

[8] *See infra* Count II (highlighting that the presence of this fact negates the Trustee's ability to pursue Count II, Fraudulent Conveyance).

non-moving party then bears the burden of proving that a material fact exists that makes summary judgment inappropriate. *IT Litigation Trust v. Alpha Analytical Labs (In re IT Group, Inc.)*, 331 B.R. 597, 600 (Bankr. D. Del. 2005).

## DISCUSSION

Sprint advances multiple arguments to dispel this adversary proceeding and, in particular, Count I, Avoidance of Preference Period Transfers. The Court will address each argument in turn.

### Count I: To Avoid and Recover Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550

### The Trustee Has Met His Burden Under 11 U.S.C. § 547(b)(5)

Section 547(b) provides that:

[T]he trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
   (A) on or within 90 days before the date of the filing of the petition; or
   (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
   (A) the case were a case under chapter 7 of this title;
   (B) the transfer had not been made; and
   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Sprint does not dispute that the Trustee has successfully established the first four factors of Section 547(b). *See* Cross-Motion ¶ 45. Sprint does, however, contend that the Trustee

has failed to satisfy Section 547(b)(5), arguing he cannot establish that Sprint received

more through the preferential payments than it would have in a Chapter 7 liquidation.

Motion at p. 3.

Section 547(b)(5) is a fundamental element of any case asserting a preference claim,

so the Court must carefully consider the issue. *In re Radnor Holdings Corp.*, 353 B.R. 820,

846-47 (Bankr. D. Del. 2006). This is a matter of first impression, as the Court has yet to

determine the relevant inquiry under Section 547(b)(5) when applied to a PMSI.

*A. The Trustee has the Burden Under Section 547(b)(5)*

The Court must first determine who among the parties bears the burden of

establishing the elements of Section 547(b). According to the Trustee, because PMSIs are

a creature of state law, the inquiry turns on whether "the underlying state law[, Virginia

in the instant case,] places the burden on the creditor asserting a secured status to prove

it is secured, [thereby shifting the burden to Sprint]." Cross-Motion ¶ 47.

The Court finds that the burden under Section 547(b) is on the Trustee. Section

547(g) provides:

> For the purposes of this section, the *trustee* has the burden of proving the
> avoidability of a transfer under subsection (b) of this section, and the
> creditor or party in interest against whom recovery or avoidance is sought
> has the burden of proving the nonavoidability of a transfer under
> subsection (c) of this section.

(emphasis added); *see In re Radnor Holdings Corp.*, 353 B.R. at 846-47 (citing *Mellon Bank,*

*N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991)) (highlighting the Trustee

has the burden under Section 547(b)(5)); *see also Golden v. The Guardian (In re Lenox*

*Healthcare, Inc.*), 343 B.R. 96, 107 (Bankr. D. Del. 2006) (same). The Supreme Court has

stated, on numerous occasions, "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (citations omitted). Section 547(g)'s plain language must overcome the Trustee's argument to the contrary. *See Batlan v. Transamerica Commercial Fin. Corp. (In re Smith's Home Furnishings, Inc.)*, 265 F.3d 959, 967 (9th Cir. 2001)

> ("One might argue that the creditor will be in a better position than the trustee to prove whether or not the alleged preferential payments came from the proceeds of the sale of its own collateral. On the other hand, in bankruptcy, it is the trustee who accedes to the debtor's books and records and has easier access and a better ability to divine the financial activities of the debtor in its last months of operation. Regardless of which side is better equipped to decipher the debtor's final financial actions, we hold that the language of the statute places the burden of demonstrating the source of such preferential payments squarely on the trustee.");

*see also In re Lease-A-Fleet, Inc.*, 151 B.R. 341, 348 (Bankr. E.D. Pa. 1993) ("It is therefore an unfortunate fact of life that a preference plaintiff must effectively prove a negative (that the defendant is *not* a totally secured creditor), even though the secured creditor is the party with most access to proof of the validity of its own security interests."). In fact, the Trustee's reading would effectively nullify the burden structure as outlined in Section 547(g).

*B. Secured Status Must be Determined as of the Petition Date*

Having determined that the Trustee bears the burden of proof under Section 547(b)(5), the Court must answer the difficult question of whether he has satisfied his burden. What largely drives the issue before the Court is the answer to the following question: is secured status assessed at the time of the transfer or the petition date? Courts

have grappled with this issue and remain at odds. *Compare In re Falcon Products, Inc.*, 381 B.R. 543, 546-48 (B.A.P. 8th Cir. 2008) (holding the petition date is proper for a Section 547(b)(5) analysis) *with Forman v. IPFS Corp. of the South (In re Alabama Aircraft Indus.)*, 2013 WL 6332688, at * 3 (Bankr. D. Del. 2013) (holding transfer date is proper for a Section 547(b)(5) analysis); *see also* Rafael I. Pardo, *On Proof of Preferential Effect*, 55 ALA. L. REV. 281, 303 (2003) ("The concept of when a transfer occurs for purposes of preference analysis has been one aspect of congressional efforts to harmonize the tension between protecting transfers to individual creditors during the preference period and increasing the distribution made to unsecured creditors."). The question is important because prepetition payment made on the basis of a secured claim normally provides a creditor only that to which it was entitled in a Chapter 7 case, i.e., eliminating the potential for a preference under Section 547(b)(5). *In re S. Air Transport, Inc.*, 511 F.3d 526, 534 (6th Cir. 2007); *see also In re El Paso Refinery*, 171 F.3d 249, 254-55 (5th Cir. 1999)

> ("[A] creditor who recovers his own collateral is not deemed to have recovered a greater percentage than he would have in bankruptcy. . . . A creditor who merely recovers its own collateral receives no more as a result than it would have received anyway had the funds been retained by the debtor, subject to the creditor's security interest.").

Sprint asserts that, due to its PMSI in both the inventory under the OAR Agreement and the proceeds from the sale of such inventory,

> Sprint [] had a first priority lien interest in the Transfers. . . [and] Sprint simply received payments to reduce first priority lien debt and continued to extend new credit under the PMSI—transactions that did not give any sort of preference to Sprint or prejudice other creditors holding unsecured claims.

14

Motion at p. 14. Complicating the issue is the fact that Simplexity kept funds in a commingled account,[9] and, as previously mentioned, Simplexity's accounts were swept by FTB on March 10, 2014. Cross-Motion ¶ 4. Sprint further asserts that "it is the Trustee's burden to prove that the Transfers came from a source other than sales of Sprint's collateral, even if the collateral proceeds were swept by another lender and comingled with funds from the sales of other goods not subject to Sprint's lien." Motion at p. 18.

Simplexity begins its argument in favor of measuring secured status as of the petition date by invoking the oft-cited Supreme Court decision of *Palmer Clay Products Co. v. Brown*, 297 U.S. 227 (1936). In a short opinion, Justice Brandeis held that the petition date—not the transfer date—was the proper date for determining a creditor's treatment in a preference action. *Id.* at 228-29. The Supreme Court was addressing Section 60a of the Bankruptcy Act, a predecessor to Section 547(b), and noted that:

> [They] may not assume that Congress intended to disregard the actual result [of the transfer], and to introduce the impractical rule of requiring the determination, as of the date of each payment, of the hypothetical question: What would have been the financial result if the assets had then been liquidated and the proceeds distributed among the then creditors?

*Id.* at 229. The seemingly clear proposition expressed in *Palmer Clay* has sparked controversy. The basis for this controversy stems from the fact that the creditor in question in *Palmer Clay* was unsecured. *See In re Rocor Intern., Inc.*, 380 B.R. 567, 571-72

---

[9] Simplexity's cash from earnings and financing sources were received in FTB 1473, and the cash collateral account consisted of FTB 1473. *See* Forensic Report ¶ 13; Adv. D.I. 37-1. Additionally, "[c]ash was transferred from the FTB 1473 account to the FTB 7211 (Simplexity Payroll) and FTB 7278 (Simplexity Accounts Payable) accounts. The FTB 7211 and FTB 7278 accounts maintained a daily balance of zero, receiving the necessary cash from the operating account to make the required payments each day." Forensic Report ¶ 13.

(B.A.P. 10th Cir. 2007). This has led some courts to believe, as Sprint argues, that *Palmer Clay* is inapplicable to situations where creditors are, for example, secured. Sprint Reply at p. 9; Adv. D.I. 48.

Sprint points to *Forman v. IPFS Corp. of the South (In re Alabama Aircraft Indus.)*, 2013 WL 6332688, at * 3 (Bankr. D. Del. Dec. 5, 2013) for support, arguing it illustrates courts' "misplaced" reliance on *Palmer Clay*. Sprint Reply at p. 9. Specifically, Sprint argues that *Alabama Aircraft Industries* provides that a transfer date analysis is the "common-sense approach." *Id.*[10] Before turning to Simplexity's rebuttal, the Court believes it is important to address Sprint's application of *Alabama Aircraft Industries.*

In *Alabama Aircraft Industries*, the court was tasked with determining the preference liability of a creditor pursuant to an insurance premium financing agreement. 2013 WL 6332688, at * 1. Although Judge Walsh references courts reading *Palmer Clay* in a narrow fashion, the Court finds the reference to be dictum. The opinion does not comment on the *propriety* of courts employing a narrow application of *Palmer Clay*, as the court merely commented on the *prevalence* of courts restricting the holding. *See id.* at * 3 ("Whether or not a lower court wants to also apply the reasoning in *Palmer Clay* to a creditor of secured status is wholly separate from what [the] Trustee incorrectly believes this court 'must' do based on *Palmer Clay*."). Thus, the Court finds that Sprint's own reliance on *Alabama Aircraft Industries* is perhaps misplaced.

---

[10] Sprint further argues that Simplexity's "flawed 'add-back' method" for tracing proceeds contributes to the transfer date being the proper secured-status date. *See* Sprint Reply at pp. 9-12. The Court addresses this issue below.

Simplexity responds to Sprint by citing *In re Falcon Products, Inc.*, claiming:

> The impetus to limit *Palmer* [*Clay*] to situations involving payments on unsecured claims is understandable—it seems almost illogical to find that a payment on a claim fully secured at the time of the transfer might be preferential under § 547(b). But the resolution of that illogic does not lie in refashioning the hypothetical liquidation test of § 547(b)(5) to incorporate elements of § 547(c) preference defenses, as many courts have done; rather it comes in the *separate* application of those defenses to the preferential transfer at issue. . . . Conflating these two analyses might be expedient, . . . but it is important to keep them separate—as an analytical and practical matter[.]. . ."

381 B.R. 543, 548-49 (B.A.P. 8th Cir. 2008). Perhaps most damning to Sprint, as Simplexity argues, is the fact that cases Sprint cites for the transfer date argument fail to detail the "very fact-specific exceptions [in each case], mainly involving premium financing situations or diminishing lien value." Simplexity Reply ¶ 18; Adv. D.I. 50; *see In re Alabama Aircraft Indus.*, 2013 WL 6332688, at * 3 (Bankr. D. Del. Dec. 5, 2013) (dealing with a premium financing arrangement); *In re Schwinn Bicycle Co.*, 200 B.R. 980, 981 (Bankr. N.D. Ill. 1996) (same); *In re 360Networks (USA) Inc.*, 327 B.R. 187, 193 (Bankr. S.D.N.Y. 2005) (dealing with inchoate liens); *see also* Paul Cohen & Lucian B. Murley, *Secured Status of Premium Finance Company Is "Abundantly Clear"*, 33-FEB AM. BANKR. INST. J. 46 (Feb. 2014) (detailing the complex nature of calculating insurance premium financing). Simplexity argues that, "[i]n the instant case, there is no inchoate or diminishing lien value, and accordingly . . . no special circumstance warranting a deviation from the general rule that even a secured creditor's status is examined as of the petition date." Simplexity Reply ¶ 18.

The Court agrees with the Trustee and finds that the proper date for determining Sprint's secured status is the Petition Date. The Court's decision today is particularly influenced by the fact that Sprint maintained a PMSI. Morrow-Campbell Decl. ¶ 4. It is hornbook law that the scope of a PMSI is less than that of a floating lien. *Compare U.C.C.* §§ *9-103 with 9-204*. Because Sprint had limited interest in Simplexity's inventory—beyond that which was identified and returned to Sprint (*see* Morrow-Campbell Decl. ¶ 18)—the Court is not persuaded that such an arrangement warrants deviating from analyzing Sprint's secured status as of the Petition Date.[11] Further supporting this conclusion is the fact that the Sprint's PMSI, consisting of headsets and the proceeds thereof, are unlikely to undergo stark changes in valuation. If Sprint had maintained a floating or "blanket" lien, the likelihood of valuation variances would be salient. Thus, although the Court recognizes that a factual scenario could arise that would warrant deviating from this approach, the instant case is not one.

*C. Liquidation Analysis Must Also be Performed as of the Petition Date, and The Trustee's "Add-Back" Method of Tracing is Satisfactory*

Subsumed within the issue of when to determine the secured status of a creditor is the issue of when to perform the liquidation analysis—the transfer date or the petition date. *See* James J. White & Daniel Israel, *Preference Conundrums*, 98 Com. L.J. 1, 11-16 (1993) (noting "[t]here is some law on this question, but it is not completely satisfactory"). Once

---

[11] The Court finds it interesting that Sprint's argument presents a situation where they would have their cake and eat it, too. More specifically, Sprint would have the Court find, in one case, *Palmer Clay* – where the creditor was unsecured – that the holding should be limited to preference actions involving unsecured creditors; and, at the same time, the Court should find, in another case, *Alabama Aircraft Industries* – dealing with insurance premium financing – that the holding should *not* be limited to only insurance premium financing transactions. Sprint's stance is inconsistent with the aforementioned law.

this issue is resolved, the Court must then determine what is the proper tracing methodology—"add-back" or otherwise.

Sprint primarily relies on *Batlan v. Transamerica Commercial Fin. Corp. (In re Smith's Home Furnishings, Inc.)*, 265 F.3d 959 (9th Cir. 2001), for the proposition that it is the Trustee's burden to establish inventory value and trace proceeds. Motion at p. 15. In *Smith's Home Furnishings*, a preference defendant financed a debtor's inventory purchases pursuant to a $25 million secured line of credit. 265 F.3d at 961-62. At the end of each day, the inventory sale proceeds were deposited into a commingled bank account and swept by the debtor's bank. *Id*. at 961. The bank would advance new funds the following day, assuming the debtor had sufficient collateral. *Id*. In the months leading to bankruptcy, the preference defendant reduced the line of credit from $25 million to $13 million. *Id*. at 961-62. After the case was converted to a Chapter 7, the trustee sought to avoid and recover over $12.8 million that the preference defendant received during the preference period. *Id*. at 962. The Ninth Circuit ultimately held that the Trustee had the burden of tracing the funds used to make the preferential payments. *Id*. at 966-68. The court's decision was largely driven by the plain language of Section 547(g), holding that "the language of the statute places the burden of demonstrating the source of such preferential payments squarely on the trustee." *Id*. at 967. The court also addressed the standard for tracing proceeds, stating that the trustee's use of the "add-back" method was insufficient to meet his burden under Section 547(b)(5). *Id*. at 963-64. As described by the court, the add-back method consists of adding the amount of alleged preferences to the amount of unpaid balance at the petition date to find the creditor's secured status. *Id*. at 963.

Sprint argues that *Smith's Home Furnishing* largely mirrors the instant case (*see generally* Motion at pp. 16-18), particularly the fact that Simplexity's accounts—consisting of proceeds belonging to various creditors—were swept by FTB days before bankruptcy. Motion at p. 16. Sprint further claims that the Trustee's use of the add-back method, as rejected in *Smith's Home Furnishing,* is similarly inappropriate here. Sprint Reply at pp. 10-12. Sprint devotes considerable effort to addressing the Trustee's alleged tracing flaws.[12] *Id.* Sprint states "the Forensic Report [of Anne M. Eberhardt] uses limited data over a limited period of time to work not from the point of sale forward, but from the point of transfer backward." *Id.* at pp. 10-11; *see generally* Adv. D.I. 37-1. More specifically, it was completed "'without access to the Debtors' accounting system'" and, instead, relied on bank statements, which were "'insufficient for [Ms. Eberhardt] to discern whether they were payments that were made on the basis of Sprint's collateral.'" Sprint Reply at p. 10 (quoting Forensic Report ¶¶ 23, 27). Similarly, Sprint takes issue with the overarching purpose of Ms. Eberhardt's report which was the "'fungibility of cash,' not tracing, and a process of elimination where certain transactions were plainly not related to the sale of Sprint's goods, and other transactions 'might or might not' have been related to the sale of Sprint's goods." *Id.* at p. 11 (citing Eberhardt Decl. ¶ 3); *see* Adv. D.I. 37-1. Lastly, Sprint argues that "the Forensic Report disregards proceeds of sale and asset based sources of lending under the revolving line of credit because inflows and outflows

---

[12] Despite Sprint's concerns regarding the propriety of Simplexity producing their expert report on the last day of extended discovery (*see* Sprint Reply at p. 11), the Court does not find this issue bears further discussion.

with the [FTB] account 'essentially offset.'" Sprint Reply at p. 11 (citing Eberhardt Decl.

¶ 6).

> Simplexity, in a summary fashion, rebuts Sprint's claims by noting that:
>
> (a) the Forensic Report describes a tracing analysis that examined the February 28, 2014 transfer[, totaling $1,001,095.20,] to [Sprint], which assumes the transfer date controls as alleged by [Sprint]; (b) the Forensic Report is based on the Debtors' bank account records, which form part of the Debtors' books and records; (c) the Forensic Report focuses on a limited period of time because the Debtors' lender swept the Debtors' bank accounts and the issues in this case revolve around the one transfer on February 28, 2014; and (d) *Smith's Home Furnishings* actually reinforces the process-of-elimination methodology employed in the Forensic Report. . . . [Lastly, Ms. Eberhardt's Forensic Report] demonstrated that as a factual matter the inflows and outflows to [FTB] 'essentially offset' each other, resulting in the replenishment of all cash in the account.

Simplexity Reply ¶¶ 6-7 (citing Eberhardt Decl. ¶ 6). Simplexity notes that the Forensic

Report reveals that, during February 2014, the Debtors' combined bank account balances

dropped from $606,917.05 to $257,054.93. Cross-Motion ¶ 65. The Forensic Report also

shows that the primary source of cash inflows was from Simplexity's lenders, namely

FTB, and $990,000.00 from Adeptio Funding. *Id.* In light of this lending arrangement,

Simplexity asserts that it "defies logic" to believe "that the source of the inflows from the

Debtors' revolving line of credit could have been cash proceeds from the sale of Sprint's

collateral or Sprint accounts receivable and inventory in the borrowing base." *Id.*

Simplexity notes that once payment was made by the Debtors to repay asset based

lenders, or any other creditor, such payment no longer constitutes "proceeds" subject to

Sprint's lien. *Id.* Simplexity further relies on U.C.C. Section 9-332, highlighting that "a

purchaser or other transferee of money or funds from a deposit account takes free of a

perfected security interest in proceeds, unless the transferee acts in collusion with the debtor in violating the rights of the secured party." Simplexity Reply ¶ 8; *see* Va. Code Ann. § 8.9A-332 (West). Because no collusion has been asserted in this case, Simplexity believes the statutory scheme in Section 9-332 ought to govern. Simplexity Reply ¶ 8.

In accordance with *Falcon Products*, 381 B.R. 543 (B.A.P. 8th Cir. 2008), the Trustee performed a liquidation analysis using the add-back method

> of analyzing a defendant's position on the petition date given a hypothetical liquidating by 1) accounting for the debt that was still owed by the Debtors to the defendant on the petition date; 2) adding back in the transfers paid in the preference period to the outstanding debt (*i.e.*, complying with Section 547(b)(5)(B)'s requirement of analyzing the situation as if 'the transfer had not been made'); and 3) comparing that debt to the collateral [as] of petition date.

Cross-Motion ¶ 52. Using the figures listed in the Debtors' Schedule F, the Trustee "performed a liquidation analysis as of the Petition Date without regard for post-petition expenses, liens, priorities, or other consideration." *Id*. ¶¶ 53-54. Simplexity notes that had they considered such postpetition expenses, "the valuation would be substantially less." *Id*. ¶ 54. Before walking the Court through their add-back analysis, Simplexity notes that, as a practical matter, because FTB and other senior secured creditors were unable to be paid in full, "it is difficult to imagine that [Sprint] could have been fully collateralized. . . ." *Id*.

**<u>Simplexity's Add-Back Analysis</u>**

Step one of the add-back method requires the liquidation analysis to account for the outstanding debt owed to Sprint as of the Petition Date. Here, the amount is

$7,292,167.55.[13] Sprint App. at A0297. Step two consists of adding back the Transfers as if they had not been made. The Transfers, according to the Trustee's Amended New Value Analysis, equal $958,198.58; adding the Transfer amount to Sprint's scheduled debt totals $8,250,366.13.[14] The final step consists of comparing the amounts owing against the available collateral. The collateral available on the Petition Date was valued on a liquidation basis, meaning the Debtors either would have to liquidate the inventory or return it to Sprint for resale. Cross-Motion ¶ 57. Simplexity opted to return Sprint's collateral, consisting of 1,114 handsets. *See* Motion ¶ 18 (showing the parties agreed what Sprint inventory Simplexity maintained as of the Petition Date). Simplexity highlights that in order for the Petition Date collateral to equal the Transfer amount, the handsets would have to be liquidated at a value of $860.14 per handset.[15] Cross-Motion ¶ 57, n. 8. Simplexity closes by noting the unlikelihood of achieving such a figure, particularly due to associated costs with pulling product, shipping and shrinkage. *Id*. ¶ 57. While Sprint takes issue with Simplexity's add-back analysis, particularly the inability to properly trace the sources of payments, Simplexity contends that they have "conclusively proven . . . that *at most* only 16% of the funds use[d] to pay [Sprint] could possibly be traced to the proceeds of Sprint's collateral." *Id*. ¶ 62.

---

[13] Although Sprint contests this amount, due to setoff rights and a contingent, unliquidated claim, the fact remains that Sprint was undoubtedly owed millions more than the value of the Transfers as of the Petition Date. Cross-Motion ¶ 55.

[14] The Trustee's figure totaled $11,135,119.41 (*see* Cross-Motion ¶ 56), but the Court has adjusted the numbers to reflect the Amended New Value Analysis.

[15] The Court has again modified the Trustee's calculation to reflect the Amended New Value analysis.

The Court finds that the Trustee's add-back method is acceptable in the instant case. Of particular importance in reaching this decision is the language used by the Ninth Circuit. As highlighted by the Trustee (*see* Simplexity Reply ¶ 14), in *Smith's Home Furnishing* the court merely held that the trustee's efforts to trace proceeds via the add-back method was insufficient "in this case[,]" i.e., a case involving a floating-lien creditor. 265 F.3d at 964. Further illustrating that *Smith's Home Furnishing*'s is inapposite is the fact that it involved a fully secured creditor. *Id*. Sprint, however, was not fully secured. *See* Simplexity Reply ¶ 16. More specifically, as of the Petition Date, "there were no funds in the Debtors' accounts . . . and [Sprint] only sought segregation of its identifiable cash proceeds received after the Petition Date." *Id*. (emphasis and citations omitted). Similarly, as of the transfer date, the Forensic Report also reveals Sprint was not fully secured. *Id*. (citing Cross-Motion ¶¶ 61-66).

The fact that a PMSI is a narrower type of security interest than a floating lien is significant. *See Norton Bankr. L. & Prac.* 3D DICT. OF BANKR. TERMS § F160 (highlighting that a floating lien "effectively creates a lien against a constantly changing mass of collateral for a loan value that will change as payments are received and further advances made"). In fact, it makes sense that the Ninth Circuit would shun the add-back method in floating lien scenarios because of the potential for jumbling the allocation of proceeds (particularly in a commingled account). However, the PMSI does not avail itself to the same concerns. Thus, the Court finds that the Trustee has satisfactorily traced the payments through the add-back method.

## Sprint's New Value Defense Under Section 547(c)(4)

Under Section 547(c)(4), a defendant may offset its total preference exposure to the extent that it later provided a debtor with "new value." More specifically, Section 547(c)(4) provides that a transfer may not be avoided to the extent that:

> after such transfer, such creditor gave new value to or for the benefit of the debtor—(A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]

Although courts addressing preferences have commonly held that Section 547(c) defenses "should be narrowly construed," *see, e.g., Hassett v. Altai, Inc. (In re CIS Corp.),* 214 B.R. 108, 119-20 (Bankr. S.D.N.Y. 1997) (quotation and citations omitted), courts have taken an expansive approach to defining "new value," noting it is:

> Money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation[.]

7 *Collier* on Bankruptcy ¶ 547.04[4] (16th ed. 2014) (quoting *Ogle v. Advent, Inc. (In re HDD Rotary Sales, LLC),* 2013 Bankr. LEXIS 1447 (Bankr. S.D. Tex. Apr. 2, 2013)); *see also* 11 U.S.C. § 547(a)(2) (codifying this definition). Section 547(c)(4) further

> codifies the concept that the estate, and consequently the other creditors, are not harmed by the transfers. If the transfer is within this exception, it was made in exchange for new value and the new value augments the estate in the same proportion as the value of the transfer; therefore, the estate does not suffer any injury.

*In re Discovery Zone, Inc.,* 300 B.R. 856, 860 (Bankr. D. Del. 2003) (citations omitted), *aff'd sub nom. In re Discovery Zone Inc.,* 2004 WL 2346002 (D. Del. Oct. 5, 2004). Section 547(c)(4)

is most often cited as serving at least two interrelated purposes: (i) to encourage trade creditors to continue dealing with troubled businesses, and (ii) to treat fairly a creditor who has replenished the estate after having received a preference. *In re New York City Shoes, Inc.*, 880 F.2d 679, 680-81 (3d Cir. 1989) (citations omitted). Thus, in a world of dog-eat-dog creditor relationships and priority disputes, the new value defense can best be viewed as a reward for a creditor's altruism. The party claiming a defense under Section 547(c) bears the burden of proof by a preponderance of the evidence. *See* 11 U.S.C. § 547(g); 7 *Collier* on Bankruptcy ¶ 547.13 (16th ed. 2017).

The thrust of Sprint's new value argument is that the Trustee's Amended New Value Analysis fails to account for two payments: (i) a $505,151.53 mid-month commission cash payment on March 12, 2014, and (ii) a $125,000.00 advance payment from Sprint on March 7, 2014 (due to Simplexity on account of the Loyalty Trial Program) (collectively the "Alleged New Value Payments"). Motion at pp. 12-13. Sprint claims that the Alleged New Value Payments fall squarely within Section 547(c)(4) and that the Amended New Value Analysis ought to reflect the Alleged New Value Payments. *Id.*

*A. The $505,151.53 Payment*

The first payment at issue is a $505,151.53 payment from Sprint Spectrum to Simplexity on March 12, 2014. Morrow-Campbell Decl. ¶ 14. The Trustee alleges that "[Sprint] has provided no explanation as to why it made this seemingly random mid-month estimated advance commission payment; why instead of offsets, [per the Commission Offset Agreements,] it was making advances." Simplexity Reply ¶ 20 (emphasis omitted). Simplexity further contends that, with regard to this payment, the

new value defense fails because: (i) Sprint was acting as a debtor and not a creditor, and (ii) Sprint merely substituted one asset of the Debtor for another (i.e., an account receivable for cash). Cross-Motion ¶¶ 75-76.

Sprint asserts that the Commission Offset Agreements resulted in them providing money not owed to the Debtor under the OAR Agreement. Sprint Reply at p. 13. In particular, Sprint claims that the "commission payment was not due under the [OAR Agreement] until the end of the month and Sprint was entitled . . . to offset the commission against the millions of dollars it was due under the OAR Agreement and the Commission Offset [] Agreements." Motion at p. 13.

Simplexity claims that the $505,151.53 payment constituted a "pre-existing deb[t] owed by Sprint to Simplexity and Simplexity [MVNO], and Sprint was merely paying its debts." Cross-Motion ¶ 75. This fact, Simplexity claims, means "[the $505,151.53] paymen[t] w[as] not money or money's worth in goods, services or new credit provided by a creditor." *Id.* (emphasis omitted).

Sprint claims that the Trustee's argument that the $505,151.53 payment merely substituted one asset of the Debtor for another ignores the fact that "the account receivable would never have been collected" due to Sprint's rights under various agreements and 11 U.S.C. § 553. Sprint Reply at p. 13.

The Debtor and Defendant do not contest that they were parties to the OAR Agreement and the Commission Offset Agreements.[16] Therefore, the dispute lies in trying

---

[16] The Cross-Motion did set out contrary language, but the Trustee's response (*see* Adv. D.I. 37) clarified this issue.

to explain the purpose of the $505,151.53 payment. The Court finds that the answer to whether Sprint should be entitled to a new value defense lies within the OAR Agreement, Commission Offset Agreements and the course-of-dealing between the parties.

The OAR Agreement's Commission Schedule is written clearly and provides that Sprint would make "[r]easonable efforts . . . to pay Commissions by the last business day of the month following the end of the Commission Period." Ex. A., ¶ 2.1. The Commission Schedule does not reference alternative payment dates, such as a mid-month estimated commission; thus, under the plain language of the Commission Schedule, Sprint was not yet obligated to pay Simplexity. Because the payment was not yet due, the Court must consider what effect this has on the Trustee's argument that Sprint was acting as a debtor—not a creditor.

As stated above, the Trustee adamantly asserts that Sprint's status at the time of the $505,151.53 payment was that of a debtor—merely paying an obligation to Simplexity, its creditor. Cross-Motion ¶ 75. Such a status would—in and of itself—warrant the Court to reject the $505,151.53 payment as new value. However, the OAR Agreement's plain language provides guidance on this issue. An end-of-the-month obligation, as prescribed in the OAR Agreement's Commission Schedule, is not the same as a mid-month payment. The Court does not deny that Sprint had a debtor-like stance, but this stance was not solidified at the time of payment.

The Trustee's second argument for declining new value—that Sprint substituted one asset for another—is critical to consider. Cross-Motion ¶ 76. Under Section 6.2 of the OAR Agreement, Sprint had the "Right to Set Off" if Sprint gave Simplexity five days'

notice. *See id.* The Trustee highlights that there is no proof that Sprint complied with the five-day notice requirement, but the Court does not find this issue dispositive. Because the payment was an advance, as opposed to a regularly scheduled payment, it is evident that Sprint was attempting to augment the Debtors' estate. Similarly, the Court finds persuasive Sprint's argument that the account receivable would have been uncollectable.

The timing of the $505,151.53 payment and the Petition Date—a mere two days apart—further influences the Court's opinion in classifying this payment as subsequent new value. Sprint was already one of the largest Simplexity creditors at the time of this payment and, as discussed above, clearly had the power to setoff against preexisting Simplexity debts. However, despite all of this, Sprint still extended a substantial sum of money to the Debtors. The parties do not reference or call to the Court's attention any other occasions where Sprint made advancements or early payments of this nature. The out-of-the-ordinary nature of this mid-month payment weighs in favor of classifying it as new value.

Even when the Court construes facts in the Trustee's favor, he has failed to successfully rebut that Sprint made the $505,151.53 payment to enhance the Debtors' estate. Sprint's payment personifies the overarching principle of Section 547(c)(4)—a beacon of light in a dark time. Thus, the Court finds that the $505,151.53 payment constitutes new value.

*B. The $125,000.00 Payment*

Pursuant to the aforementioned PLS Agreement, Sprint issued a check to Simplexity for $125,000.00 due on account of Phase II of the Loyalty Trial Program.

Morrow-Campbell Decl. ¶ 13; *see* PLS Agreement, Ex. C., A0216-0220. Sprint's $125,000.00 payment cleared on March 7, 2014, and was subject to clawback if Simplexity failed to perform its duties by March 31, 2014. Morrow-Campbell Decl. ¶ 13; *see* PLS Agreement, Ex. C. Specifically, Phase II's "Eligibility Condition" provides that "if [Simplexity Services] executes an agreement for a Loyalty Trial with at least one Trial Participant by March 31, 2014, [Simplexity MVNO] will be eligible to receive the Phase II Loyalty Trial Funds[, totaling $125,000.00]. . . ." *Id.*[17]

Sprint nakedly asserts that Simplexity failed to satisfy Phase II of the Loyalty Trial Program and did not refund the money. Morrow-Campbell Decl. ¶ 13; Motion ¶ 13. Simplexity, however, contends that Sprint has failed to present any evidence in support of its claim. Cross-Motion ¶ 76. Simplexity also claims that there is no indication that Sprint made a written refund request by the June 30, 2014, cutoff date. *Id.*; *see* PLS Agreement, Ex. C, Phase II Loyalty Trial Funds Advance Payment/Refund, A0218. Because the $125,000.00 payment was an advance, the pivotal question (i.e., material fact to be resolved) is whether or not Simplexity MVNO enlisted one Trial Participant by the March 31, 2014, deadline.[18]

Bankruptcy Rule 7056(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The parties fall short of satisfying

---

[17] Defined terms have the meaning ascribed to them in the PLS Agreement.
[18] The Court finds that whether Sprint requested a refund in the appropriate time is a subsidiary concern.

Rule 7056(a). They make little effort to address the $125,000.00 payment and have left the Court wondering if Simplexity satisfied Phase II.[19] The Court, absent additional information, must deny the Motion and Cross-Motion because genuine issues of material fact exist.

### Count II: Avoidance of Fraudulent Conveyances Pursuant to 11 U.S.C. § 548(a)(1)(B)

The Trustee, in the alternative, has plead fraudulent conveyance to the extent that one or more of the Transfers "was not made on account of an antecedent debt or was a prepayment for goods and/or services subsequently received. . . ." Complaint ¶ 42; Adv. D.I. 1. Both parties, however, admit that each of the Transfers was made on account of an antecedent debt and were not a prepayment for goods or services subsequently received. Morrow-Campbell Decl. ¶ 21; Cross-Motion ¶ 31. Therefore, the Court cannot decide this issue based on the current record. *See Walker v. Sonafi Pasteur* (*In re Aphton Corp.*), 423 B.R. 76, 89 (Bankr. D. Del. 2010) (citations omitted) ("Courts have held that when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent.").

### Counts III and IV: Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550 and Disallowance of all Claims Pursuant to 11 U.S.C. § 502(d) and (j)

The Trustee also asks the Court to disallow Sprint's claim in Simplexity's bankruptcy case. The Trustee's request for disallowance depends upon Section 502(d)

---

[19] The Court recognizes the limited time Simplexity MVNO would have had to complete Phase II, as demonstrated by the following timeline:
- March 7, 2014: Sprint's $125,000.00 payment cleared
- March 14, 2014: Simplexity filed for bankruptcy
- March 31, 2014: Phase II's conditions had to be satisfied

31

which provides for disallowance of a claim if the claimant is liable for avoidance recoveries. Sprint may be liable for $125,000.00. Accordingly, Sprint's claim will be allowed except for $328,047.05, which Sprint concedes is a valid preference amount (*see* Motion at p. 13), and the $125,000.00 preference claim which remains at issue.

**CONCLUSION**

The Court will grant the following relief:

1.     The Court will grant the Motion and holds that Sprint is entitled to a new value defense for the $505,151.53 payment. The Cross-Motion on the same issue is denied.

2.     The Court will deny the Motion and Cross-Motion on the issue of awarding Sprint a new value defense for the $125,000.00 payment.

3.     The Court will grant the Motion on the allowance of $505,151.53 of Sprint's claim, and will deny the Motion as to the allowance of $125,000.00 of the claim. The Court will deny the Cross-Motion as it relates to claims allowance.


Dated: December 5, 2017

_____
KEVIN GROSS, U.S.B.J.